No. 29,317.

THE CITY OF EMPORIA, *Appellant,* v. HATTIE HUMPHREY, *Appellee.*

(299 Pac. 950.)

Opinion denying a rehearing filed June 6, 1931. (For original opinion of reversal see 132 Kan. 682, 297 Pac. 712.)

*Roscoe W. Graves* and *O. L. Isaacs,* both of Emporia, for the appellant.

*Bennett R. Wheeler, S. M. Brewster, John L. Hunt, Virgil V. Scholes* and *Margaret McGurnaghan,* all of Topeka, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: In a motion for rehearing defendant quotes the last paragraph of the opinion of the court, and says:

"Under this order . . . it will become the duty of the trial court, if it finds that the building encroaches upon Commercial street so much as an. inch, to order such encroachment abated within a reasonable time. . . ."

We did not understand the case to deal with a situation in which the encroachment would be found to be so small in extent, and possibly that feature was not given as much attention as it should have received. We did have that possible situation in mind in writing syllabus 3, where it was held that when the governing body of a city determines that an encroachment upon a street should be removed, the court should not review the prudence of that determination unless it is charged and shown to have been arbitrary, capricious, or not made in good faith. The point was briefly discussed in the opinion (132 Kan. 687, 297 Pac. 712). If the encroachment of a permanent building upon a street were not more than an inch a court might very well say, as a matter of law, that the determination of the governing body of the city that it be abated was arbitrary and unreasonable; but this could not be said if the encroachment is substantially three feet, as contended by the plaintiff in this action. We are not called upon in this case to determine whether an order to abate an encroachment of one, two or three inches would be arbitrary and unreasonable because of the slight extent of the encroachment, while one of a greater extent would not be unreasonable. Those matters will be determined if and when presented. In arguing this point defendant mingles with it the

argument, heretofore considered, on the question of the estoppel of the city. We held that estoppel does not operate against the plaintiff in this case, and we have no disposition to modify our holding on that question. Other points argued in the motion for rehearing have been fully considered and determined. It is unnecessary to. enlarge upon them here. In view of the point first above discussed, and with the hope of avoiding confusion on the new trial, the closing part of the opinion is modified so as to read:

"If the finding is that the building does not encroach upon the street, judgment should be for defendant, but if the finding is that the building does encroach upon the street, judgment should be that the encroachment be abated within a reasonable time, unless the extent of the encroachment is so small that the court can say, as a matter of law, that the determination of the governing body of the city that it be abated is arbitrary and unreasonable. It is so ordered."

The motion for a rehearing is denied.

SLOAN, J., not participating.

BURCH, J. (dissenting): The writer was not satisfied with the original opinion. Under the stress of circumstances he was not able to write anything, and neglected to see to it that he was marked as dissenting.

In order that the significance of the decision may be appreciated, the story of the case should be told. It is told in the findings of the district court. Omitting those which are formal, the findings follow:

"9. No notice was ever served upon Mrs. Hattie Humphrey or upon Edwin W. Humphrey by the city or by anyone for the city, notifying either of them as to where the city claimed the east property line of lots three hundred seventeen (317) and three hundred nineteen (319) Commercial street was located, or where the south property line of said lots on Eleventh street was located.

"10. For many years prior to July, 1922, and in 1922, Edwin W. Humphrey was the owner of lots 317 and 319 on Commercial street, Emporia, Kan., and said lots fronted on Commercial street.

"11. Many years prior to 1922 the said Edwin W. Humphrey obtained from the proper authorities of the city of Emporia permission to erect a building on said lots 317 and 319, and did erect buildings on said lots, which buildings faced south on Eleventh street.

"12. Some time in July, 1922, said Edwin W. Humphrey obtained from the proper authorities of the city of Emporia a permit to erect a building on lots 317 and 319 Commercial street, facing east on Commercial street.

"13. The original permit was given for the erection of a building sixty-

eight feet long east and west and forty-nine feet wide north and south, facing east on Commercial street, to cost approximately five thousand dollars.

"14. Prior to the commencement of any work on said building, or on the excavation for the basement of said building, one Fred Whipple and said Edwin W. Humphrey went to the office of the fire chief of the city of Emporia with reference to obtaining a permit for a stairway and fire escape over on to Eleventh street.

"15. At said time the said Edwin W. Humphrey notified the fire chief of the city of Emporia that the contractor was ready to commence work on said building on lots 317 and 319, and that he desired the property lines of said lots established, and the fire chief referred him to the office of the city engineer.

"16. Thereupon the said Humphrey and Whipple went to the office of the city engineer and Humphrey notified the said engineer, or one of his assistants, that the contractor was ready to commence work on the excavation for said building, and that he, Humphrey, desired the property lines established so that work could be begun on said building, and was informed that some one from the engineering department would make such survey.

"17. Afterwards, and on the —— day of ————, 192—, and prior to excavation for such building, one ——— Chamness, then connected with the city engineering department, and working for the city, went under directions from the city engineering department to the said premises and proceeded to survey and establish the property lines of lots 317 and 319, determining where the property line was on the east and south sides of said lots, and established and set out stakes designating said property line.

"18. At the time of the survey and the establishment of said lines there was a sidewalk in front of said lots, which sidewalk had been in the same position for more than twenty-seven years.

"19. The said Chamness established the east property line of said lots to be at and along the west side of said sidewalk.

"20. The said Chamness acting for the city established the southeast corner of lot 317 to be at a point extending an inch or two over the west line of said sidewalk, and marked such corner on said sidewalk. He found the northeast corner of said lot to be at a point on said sidewalk line, and set a stake at said point. He established the southwest corner of said lot on Eleventh street, and also placed a stake along the south line of said lot for the purpose of designating the southwest corner of said proposed building, and placed a stake designating the northwest corner of said proposed building. At a point marked on the sidewalk at the southeast corner of said building, the contractor, in the presence of said surveyor, chiseled a mark to designate said point, and a line was run from said point designating the southeast corner of said building to the stake designating the northeast corner of said building, and a line was run from said point in said sidewalk along the south side of said proposed building to the stake set for the southwest corner of said building, and a line was run from the stake set as designating the northeast corner of said building to a stake set to designate the northwest corner of said building.

"21. All of said stakes were set at points designated by the said city engi-

neer, and the lines set from the mark designating the southeast corner of said building to the stake designating the northeast corner of said building, ran along and marked the property line of said property fronting Commercial street on the east as established by said survey.

"22. The line extended from the southeast corner as marked on said sidewalk west along the south side of said proposed building to the stake set for the southwest corner mark and designated the south property line of lot 317 as found and designated by said Chamness at said time.

"23. Prior to such survey and some time in ———, 19——, the said Chamness established by survey for one Mason McCarty the property line of certain lots on west side of Commercial street with reference to the west line of Commercial street and established the east property line of said lots' to be adjacent to the west side of the sidewalk on Commercial street. Such line so established is the same north-and-south line as that established as the east property line for lots 317 and 319 Commercial street by the said Chamness for Edwin W. Humphrey.

"24. Immediately after the survey and the establishment of the lines as set out in findings 14 to 22, inclusive, the said contractor proceeded to and did excavate the basement for said building and in accordance with the lines so set and established.

"25. Thereupon the said Edwin W. Humphrey proceeded to erect a two-story building, the east line of which was the line so staked out and designated by said Chamness.

"26. After the construction of said building had been commenced, some question arose between the lot owner and the city of Emporia as to the kind of material to be used in the construction of said building, the original contract calling for the use of hollow concrete blocks.

"27. The use of said blocks was objected to by the fire chief of the city of Emporia, and it was then arranged to erect a two-story building partly. of reinforced concrete and the same was so erected.

"28. During the process of such erection the mayor and the other two members of the city commission of the city of Emporia, in their official capacity, went to the place where said building was being erected, for the purpose of determining whether the said Edwin W. Humphrey should be granted the right to place his fire escape so that it projected a certain distance over the property line and on and in to Eleventh avenue.

"29. Said commission viewed said building, saw the stakes set for the same, both as to the east and south lines of said building, and such commission agreed that said Humphrey might erect his fire escape so that it projected over on to Eleventh avenue.

"30. Said city commission at said time made no complaint to the said Humphrey about the location of said building, and made no claim that said building was not being erected on the property line of said lots.

"31. From time to time during the construction of said building the fire chief visited the said building, saw its construction, and knew where the lines of said building were, both on the east and south sides.

"32. From time to time during the construction of said building the mayor

of said city visited the same and knew exactly the lines on which said building was being erected, both on the east and on the south.

"33. Mr. Chamness, the surveyor, knew of the erection of the McCarty building on the line where it was erected north and south on Commercial street, facing east, and made no objection to the lines so used.

"34. Said Chamness knew that the building on lots 317 and 319 was being built on the line established by him, running north and south on the east side of said lots, and made no complaint to said Humphrey or to anyone that said building was not being built on the property line of said lots, nor did he make any complaint to the city, or notify the city that said building was being builded on what was claimed to be other than the property line north and south on the east side of said lots.

"35. Said Humphrey at the time he erected said building believed that he was erecting said building on the property line on Commercial street and Eleventh avenue, and acted in good faith, and expended about thirty-five thousand dollars in the erection of said building.

"36. At the time of the granting of the permit to build the brick building facing on Commercial street there had already been erected, with the permission of the city and under permits given by the city, buildings on said lots coming to within approximately sixty-eight or sixty-nine feet of the east line of said brick building as it was afterwards built.

"37. The city, through its officers, well knew the location of said building and knew the distance it extended east on said lots.

"38. There is a sidewalk on east abutting said building and extending north and south on Commercial street, between Eleventh and Twelfth avenues, which is approximately eight feet wide. Immediately east of said sidewalk there is a parking eighteen feet wide, and east of said parking there is a pavement forty feet wide, and east of said pavement there is a parking sixteen feet wide, and east of said parking is a sidewalk eight feet wide.

"39. The three feet west of the sidewalk line between Eleventh and Twelfth avenues on Commercial street, claimed by the city to be a part of said Commercial street, has never been used by the public as a part of said street and is not now being so used.

"40. Said building as now erected does not in any way interfere with the public's use of said street. There is no evidence, nor is there any claim on the part of the city that said city intends any widening of Commercial street, or any use of said three feet.

"41. The pavement on Commercial street can be widened from its forty feet of present paving—thirty-five and three-tenths additional feet without interfering in any way with the sidewalks as now established and laid.

"42. The city has wholly failed to establish the alley line of said lot 317.

"43. Prior to the commencement of this action no survey, as disclosed by the evidence, was made by the city for the purpose of determining the lot line on Eleventh avenue and Commercial street between Eleventh and Twelfth avenues of the lots described in the amended petition.

"44. The cost of said brick building facing on Commercial street was approximately thirty-five thousand dollars.

"45. It is impossible to remove said building, or any part thereof, from its present location except by cutting off a part of said building.'

"46. To remove the front of said building fronting on Commercial street three feet west, it would be necessary to cut off and destroy more than three feet of said building east and west; to tear out steel reinforced concrete and rebuild a foundation north and south on the east front of said building, and to reconstruct said building, and the expense of such reconstruction and tearing down would be approximately the sum of six thousand dollars.

"47. It is impossible to remove the south side of said building from its present location without cutting off and destroying a portion of said building.

"48. To remove said building as insisted upon by the city of Emporia would require the entire south side of said building, now partly of reinforced concrete, to be torn down, a new foundation built, and the south side reconstructed at least five inches north of its present location; and such tearing down and rebuilding of said south side would cost approximately ten thousand dollars.

"49. The total cost of removing said building as to the east and south sides thereof would be approximately sixteen thousand dollars.

"50. The defendant's building is a two-story building, the upper story of which is occupied by four apartments, two at the east and two at the west part of said building. The rooms on the front are living rooms and are ten by thirteen feet. Said rooms, if said building were removed as prayed for by the city, would be reduced to nine and one-half feet by ten feet, and such removal would materially damage and reduce the value of said building.

"51. The lower part of said building has been leased by the defendant and said lease has three years to run. If said building is removed, or altered, the rental value of said property would be greatly damaged.

"52. If said building were removed, or altered, the same would have to be vacated as to all of the lower floor and at least the east apartments of the upper floor, until said removal and reconstruction had been completed.

"53. Even though said building extends into and upon said street, as alleged in the plaintiff's petition, such extension does not in any way interfere with the public's use of said street, and there appears at this time no public necessity or need for convenience or otherwise, for the removal thereof.

"54. Edwin W. Humphrey erected said building in good faith and believed that he was erecting the same upon the true property lines of his lots.

"55. The city of Emporia and its officers knew at the time said building was being erected that it was being erected on lines which said Humphrey claimed and believed to be the correct property line of his lots; and said city and its officers made no objection whatever to the erection of said building on the lines as herein found; and stood by and knew that said building was being so erected.

"56. The building so erected is erected upon the property lines of said lots as found and established by one Chamness, working out of the office of the city engineer, and for said city at the time of the erection of said building.

"57. At no time did any of the city officers make any complaint to said Edwin W. Humphrey in regard to the erection of his buildings.

"58. From the time excavation was begun for said building until the completion of said building the mayor and city commissioners, the fire chief, the engineer, and the assistant engineer of said city knew that said building was being erected on the site it now occupies, and knew that it was being erected on the lines run by the said Chamness.

"59. The said Chamness, working out of the office of the city engineer, and under the direction of the city engineer, when he ran the line on the east side of said lots was running the line to determine the property lines of said lots on Commercial street, and did run and establish the line as marked and staked by him as the property line of said lots on Commercial street.

"60. There was no testimony introduced showing or tending to show that the governing body of the city of Emporia in regular meeting by proper action, deemed and declared it to be necessary and expedient that the entire width of Commercial street and Eleventh avenue be made available for and devoted to the accommodation of the public as a public thoroughfare.

"61. There was no evidence introduced showing or tending to show that all of the lots abutting on and adjoining Commercial street from Twelfth avenue on the north and southward to the original business section of the city of Emporia had been zoned for business purposes by ordinance passed by the city of Emporia.

"62. No evidence was offered showing or tending to show that Commercial street adjoining the buildings on said street was a connecting link in any state highway.

"63. The court finds from the evidence that the sidewalk is amply large enough to take care of all the pedestrian traffic along and upon Commercial street.

"64. It is possible to widen the forty feet of pavement now existing thirty-three additional feet and yet have twelve-foot sidewalks on each side of Commercial street without using any portion of the ground claimed by the city to belong to Commercial street and occupied by the building on lots 317 and 319 Commercial street.

"65. No evidence appears offered of congestion of any kind in the traffic along and upon Commercial street between Eleventh and Twelfth avenues or along or upon any other place on Commercial street, either pedestrian traffic or vehicular traffic.

"66. The court finds that the building of defendant was placed in its present position and location with consent, knowledge and acquiescence of the city of Emporia. That such extension does not in any way interfere with the use of the street by the public and is not detrimental to the use of the street by the public.

"67. The court finds that said building does not constitute an annoyance and a nuisance, and does not in any manner or way damage the public either specially or generally and is not a damage to and does not in any manner or way damage the near-by real property nor decrease the value of any or all of said property."

We have here a man about to erect a building, who took all the precautions a reasonable man could be expected to take to locate

his building properly. The record discloses no previous, or for that matter subsequent, survey effectively establishing the west line of Commercial street. At the builder's request the city engineering department located his lot lines, and the building was erected accordingly. The city commission saw the stakes set for construction of the building, and viewed the building. The mayor visited the building and knew the lines. The fire chief saw the construction of the building and knew the lines. The surveyor knew the building was being constructed on his lines. Acting under the belief in good faith that his building was properly located, and with the knowledge, consent and acquiescence of the city, the owner spent $35,000 in its construction.

When the city engineering department located the lines there was an eight-foot sidewalk in front of the lots which had been there for years and which is still there. The building did not encroach on the sidewalk, and there is no pretense that the city desires or contemplates any change in the sidewalk, which is in fact ample to take care of all pedestrian traffic. East of the sidewalk is parking eighteen feet wide. East of the parking is a paved way forty feet wide. East of the pavement is parking sixteen feet wide, and east of that another sidewalk eight feet wide. The city never has declared it necessary or expedient to make the entire width of the street available as a public thoroughfare, and there is no pretense that any change for traffic purposes is in contemplation.

The building does not in fact interfere with public use of the street. No public need or convenience would in fact be subserved by removal of the building. The building does not in fact constitute a nuisance or an annoyance, and does not in fact in any way cause any public or private injury.

While the city is not just now insisting on removal of the building from the side street, the city holds threat of removal over the head of Mrs. Humphrey, who appears to have succeeded her husband, and she is in fact coerced to remove, at a cost of $16,000. This must be done at the low point of a period of economic depression, when she probably could not borrow that much money to build new, much less to destroy.

The judgment of the district court was reversed because it did not find whether there was any encroachment, and if there was, how much. The law of encroachment was laid down in the first

opinion without respect to any known extent of encroachment. Encroachment of an inch (a concrete expression for the indefinite "unsubstantial encroachment") was not urged upon the attention of the majority of the court for the first time in the petition for rehearing, and the opinion on rehearing says the subject was in mind when syllabus 3 was written. Under these circumstances syllabus 2 was written, which reads:

"A permanent encroachment upon a public street for a private purpose is a purpresture and is in law a nuisance *per se.*" (*City of Emporia v. Humphrey*, 132 Kan. 682, 297 Pac. 712.)

Syllabus 2 is not modified, and the original opinion is not modified in any particular by the opinion on rehearing. The result is that without any finding of encroachment, or extent of encroachment if there be encroachment, and with possibility of encroachment of an inch having been considered, the court declared that a permanent encroachment is a purpresture and a public nuisance *per se.*

That a permanent encroachment is a nuisance *per se* is a rule of law. Good faith or bad faith of the city authorities has nothing to do with it. We are accustomed to regard it as a duty resting on city officials to abate public nuisances which admit of no inquiry into the fact of nuisance, and syllabus 2 requires removal. It seems, however, there may be inquiry into good faith of city officials in abating an indisputable public nuisance.

With the original syllabus unmodified and the original opinion unmodified, what can the district court do under the modified order, if there is encroachment? The encroachment must be so small that the court can say as a matter of law that the city officials acted arbitrarily and unreasonably. Whether official conduct is arbitrary and unreasonable is a question of fact, to be determined upon consideration of all relevant facts. In this instance the owner was not guilty of negligence in erecting the building according to the lines run for him by the city engineering department, but the fact is of no consequence. That the building does not in fact interfere with and is not in fact detrimental to use of the street by the public is of no consequence. That the building is not in fact a nuisance or annoyance is of no consequence. That to conserve no public use of the street the owner must expend $16,000 in making the building less serviceable to her is of no consequence. No consideration of justice, equity, conscience, fairness or decency is of any consequence. In order to determine arbitrariness and unreasonableness of human conduct, the court is limited to use of one instrumentality—a yard-

stick, not metaphorically, but literally. So many inches in space equal good faith; so many inches equal bad faith—not good faith or bad faith in fact, but good faith or bad faith in law. The result is that in an injunction case the district court is in the condition described in some quarters as "hog tied."

Streets are for public travel, and the interest to be conserved is use of the street for public travel. As against that interest, mistake in locating the building, consent of public officials, expense of removal, and the like, may not prevail. The public interest must be fully conserved. But an order of removal made without regard to the public interest is arbitrary and capricious. The court may always investigate that subject, and when, as in this instance, the public interest is not affected in any particular, removal is not ordered in contemplation of any public interest or convenience, and removal is financially disastrous to the innocent lot owner, a court of equity may stay its hand until the public interest is substantially affected. Any other doctrine makes the law odious and brings the administration of justice into deserved contempt.

SMITH, J., joins in this dissent.

